No. 24-60026

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

MAR-JAC POULTRY MS, L.L.C.,

Petitioner,

v.

SECRETARY,
UNITED STATES DEPARTMENT OF LABOR

Respondent.

On Petition for Review of the Final Order of the
Occupational Safety and Health Review Commission
No. 21-1347

BRIEF FOR THE ACTING SECRETARY OF LABOR

SEEMA NANDA
Solicitor of Labor

EDMUND C. BAIRD
Associate Solicitor of Labor for
Occupational Safety and Health

LOUISE McGAULEY BETTS
Counsel for Appellate Litigation

LANITA L. McWILLIAMS
Attorney
U.S. Department of Labor
200 Constitution Ave., NW, Suite S-4004
Washington, DC 20210
(202) 693-5426
mcwilliams.lanita.l@dol.gov

May 13, 2024

# CERTIFICATE OF INTERESTED PERSONS

## Mar-Jac Poultry MS, L.L.C. v.
## Secretary, U.S. Department of Labor
## No. 24-600-26

The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of this case. The undersigned makes these representations so that the judges of this Court may evaluate possible disqualification or recusal.

**Respondent, U.S. Department of Labor:**

Juile Su, Acting Secretary of Labor

Douglas L. Parker, Assistant Secretary for Occupational Safety and Health Administration

Courtney Bohannon, Area Director, Occupational Safety and Health Administration

Jermaine Davis, Compliance Safety and Health Officer

Patrick Whavers, Compliance Safety and Health Officer

Seema Nanda, Solicitor of Labor

Edmund C. Baird, Associate Solicitor for Occupational Safety and Health

Louise McGauley Betts, Counsel for Appellate Litigation, Occupational Safety and Health

LaNita L. McWilliams, Attorney

Tremelle I. Howard, Regional Solicitor

Schean G. Belton, Associate Regional Solicitor

Matthew McClung, Trial Attorney

**Occupational Safety and Health Review Commission:**

Cynthia L. Attwood, Chair

Sharon D. Calhoun, Administrative Law Judge

John X. Cerveny, Executive Secretary

**Petitioner, Mar-Jac Poultry MS, L.L.C.:**

Mar-Jac Poultry MS, L.L.C.

Sherifat Oluyemi, Wimberly, Lawson, Steckel, Schnieder & Stine, P.C., Counsel for Petitioner

J. Larry Stine, Wimberly, Lawson, Steckel, Schnieder & Stine, P.C., Counsel for Petitioner

/s/ LaNita L. McWilliams
LaNita L. McWilliams
*Attorney of Record for Respondent,*
*Acting Secretary of Labor*

## STATEMENT REGARDING ORAL ARGUMENT

The Acting Secretary of Labor believes the Court can decide this petition for review on the papers and does not request oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................ii

STATEMENT REGARDING ORAL ARGUMENT ................................iv

TABLE OF CONTENTS ....................................................................v

TABLE OF AUTHORITIES................................................................vii

STATEMENT OF THE ISSUES.............................................................1

STATEMENT OF THE CASE ...............................................................3

   I.  Procedural History ..........................................................................3

   II. Statutory and Regulatory Background..........................................4

   III. Statement of Facts .......................................................................8

     A. Mar-Jac's Poultry Processing Plant Operations. ........................8

     B. A Mar-Jac Employee is Caught in an Eviscerator and Dies........14

     C. The ALJ Affirms OSHA's Two-Item Citation Alleging Serious
        Violations of the Machine Guarding and Safety Instruction Signs
        Standards. .................................................................................14

SUMMARY OF THE ARGUMENT .....................................................18

ARGUMENT ......................................................................................20

   I.  Standard of Review ....................................................................20

   II. The ALJ Correctly Determined that Mar-Jac Violated the Machine
      Guarding Standard, 29 C.F.R. § 1910.212(a)(1), and the Safety
      Instruction Signs Standard, 29 C.F.R. § 1910.145(c)(3)................21

     A. Mar-Jac Violated Section 1910.212(a)(1) When It Failed to
        Physically Guard the Catch Point and Rotating Parts Hazards
        Posed by the Line 2 Eviscerator's Carousels...............................22

       1.   The Eviscerator's Carousels Required Guarding Because
          Employees Routinely Accessed the Zone of Danger to Remove
          Material by Hand. .................................................................24

       2.   The Safety Cord, Emergency Stop Button, Tools, and Work
          Rules Did Not Satisfy the Standard's Guarding Requirements.
          ..............................................................................................29

3. The ALJ Did Not Abuse Her Discretion When Determining the Zone of Danger Was Near the Eviscerator's Rotating Carousels. ...................................................................35

B. Mar-Jac Violated Section 1910.145(c)(3) by Failing to Post Safety Signs Instructing Employees to Avoid the Line 2 Eviscerator's Danger Zone. ........................................................37

C. Mar-Jac Had Knowledge of the Violations Because the Eviscerator's Unguarded Condition and Lack of Safety Instruction Signs Were Open and Obvious to Supervisors in the Area. ...........................................................................38

D. Fifth Circuit Precedent Does Not Require Reference to Industry Custom to Establish Noncompliance with Standards that Specify the Circumstances Requiring Mar-Jac to Implement Safety Measures, and Even if It Did, Mar-Jac Had Adequate Notice. ... 42

III. Mar-Jac's Violation of the Safety Instruction Sign Standard, 29 C.F.R. § 1910. 145(c)(3), is Serious Because It Could Lead to Death or Serious Harm and Did. ..................................................51

IV. Mar-Jac Did Not Establish the Affirmative Defense of Unpreventable Employee Misconduct Because Employees Flagrantly Violated Its Work Rule. ...............................................54

CONCLUSION .........................................................................59

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.E. Burgess Leather Co. v. Occupational Safety & Health Rev. Comm'n,*
  576 F.2d 948 (1st Cir. 1978) ................................................. 46

*Aerospace Testing Alliance,*
  2020 WL 5815499 (OSHRC Sept. 21, 2020) ........................................ 25

*Akron Brick & Block Co.,*
  1976 WL 5896 (OSHRC Jan. 14, 1976) .................................... 30, 32, 58

*Amforge Div., Rockwell Int'l,*
  1980 WL 10594 (OSHRC May 6, 1980) ............................................. 47

*B&B Insulation, Inc. v. Occupational Safety & Health Rev. Comm'n,*
  583 F.2d 1364 (5th Cir. 1978) ................................................. 45

*B.C. Crocker,*
  1976 WL 6125 (OSHRC Oct. 13, 1976) ................................... 23, 24, 32

*Brock v. City Oil Well Serv. Co.,*
  795 F.2d 507 (5th Cir. 1986) ......................................... 45, 49, 51

*Calpine Corp. v. Occupational Safety & Health Rev. Comm'n,*
  774 F. App'x 879 (5th Cir. 2019) ............................................. 56

*Cape & Vineyard Div. of New Bedford Gas v. Occupational Safety & Health Rev. Comm'n,*
  512 F.2d 1148 (1st Cir. 1975) ................................................ 46

*Carlisle Equip. Co. v. Sec'y,*
  24 F.3d 790 (6th Cir. 1994) .................................................. 43

*Cleveland Elec.,*
  No. 84-696, 1987 WL 89048 (OSHRC Feb. 13, 1987) ............................. 43

*ConAgra Flour,*
  No. 88-2572, 1992 WL 215113 (OSHRC Aug. 18, 1992) .......................... 52

*Consolo v. Fed. Mar. Comm'n,*
  383 U.S. 607 (1966) ..............................................................21

*Corbesco, Inc. v. Dole,*
  926 F.2d 422 (5th Cir. 1991) ....................... 33, 34, 44, 49, 50

*Dole v. Arco Chem. Co.,*
  921 F.2d 484 (3d Cir. 1990) .................................................36

*Donovan v. Royal Logging Co.,*
  645 F.2d 822 (9th Cir.1981) .................................................36

*E. Tex. Motor Freight, Inc. v. Occupational Safety & Health Review
  Comm'n,*
  671 F.2d 845 (5th Cir. 1982) ...............................................53

*Echo Powerline, L.L.C. v. Occupational Safety & Health Review
  Comm'n,*
  968 F.3d 471 (5th Cir. 2020) ....................... 21, 43, 44, 45, 49

*Emery Chemicals, Div. of Nat'l Distillers & Chem. Corp.,*
  No. 86-457, 1987 WL 245400 (OSHRC May 4, 1987) ...................54, 55

*Fabricated Metal Prods.,*
  No. 93-1853, 1997 WL 694096 (OSHRC Nov. 7, 1997) .......................25

*Faultless Div., Bliss & Laughlin Indus., Inc. v. Sec'y of Lab.,*
  674 F.2d 1177 (7th Cir. 1982) .............................................46

*Fla. Gas Contractors, Inc.,*
  No. 14-0948, 2019 WL 995716 (OSHRC Feb. 21, 2019)......................35

*Gold Kist, Inc.,*
  No. 93-1853, 1979 WL 8519 (OSHRC Oct. 31, 1979) .................... 49, 50

*H.B. Zachry Co. v. Occupational Safety & Health Rev. Comm'n,*
  638 F.2d 812 (5th Cir. 1981) ...............................................37

*Ladish Co.,*
  No. 78-13841981 WL 18933 (OSHRC 1981).........................46

*Loren Cook Co.,*
  No. 04-2179, 2006 WL 2180649 (OSHRC June 19, 2006)...................33

*Manson Constr.*,
   No. 14-0816, 2017 WL 1788442 (OSHRC ALJ Apr. 27, 2017)............43

*Martin v. Occupational Safety & Health Rev. Comm'n*,
   499 U.S. 144 (1991) ................................................................................5

*Henkels & McCoy, Inc.*,
   No. 18-1864, 2022 WL 3012701 (OSHRC July 21, 2022)..............26, 57

*Phoenix Roofing, Inc. v. Dole*,
   874 F.2d 1027 (5th Cir. 1989) ............................................................21

*Phoenix Roofing, Inc.*,
   No. 90-2148, 1995 WL 82313, at *3-4 (OSHRC Feb. 24, 1995), aff'd, 79
   F.3d 1146 (5th Cir. 1996)............................................................. 39, 41

*Pride Oil Well Serv.*,
   No. 87-692, 1992 WL 215112 (OSHRC Sept. 24, 2021) ......................58

Riverdale Mills Corp. v. Occupational Safety & Health Rev. Comm'n,
   229 F. App'x 11 (1st Cir. 2002) ......................................................30, 31

*Sanderson Farms v. Perez*,
   811 F.3d 730 (5th Cir. 2016).........................................................22, 35

*Sanderson Farms v. Occupational Safety & Health Review Comm'n*,
   964 F.3d 418 (5th Cir. 2020)..........................................................46, 49

*S&H Riggers v. Occupational Safety & Health Rev. Comm'n*,
   659 F.2d 1273 (5th Cir. 1981) .............................................................44

*Shaw Constr., Inc. v. Occupational Safety & Health Review Comm'n*,
   534 F.2d 1183 (5th Cir. 1976)..............................................................53

*Slyter Chair, Inc.*,
   No. 1263, 1976 WL 5947 (OSHRC Apr. 8, 1976)..................................23

*Southern Hens, Inc. v. Occupational Safety & Health Review Comm'n*,
   930 F.3d 667 (5th Cir. 2019).....16, 17, 23, 24, 25, 27, 28, 31, 34, 35, 40,
   56, 58

*Stacey Mfg. Co., Inc.*,
   No. 76-1656, 1982 WL 22594 (OSHRC Mar. 23, 1982)..................24, 33

*TNT Crane & Rigging, Inc. v. Occupational Safety & Health Rev. Comm'n,*
821 F. App'x 343 (5th Cir. 2020) ..........................................................58

*TNT Crane & Rigging, Inc. v. Occupational Safety & Health Rev. Comm'n,*
74 F.4th 347 (5th Cir. 2023) ................................................................57

*Trinity Marine Nashville, Inc. v. Occupational Safety & Health Rev. Comm'n,*
275 F.3d 423 (5th Cir. 2001) ..........................................................21, 51

*W.G. Yates & Sons v. Occupational Safety & Health Rev. Comm'n,*
459 F.3d 604 (5th Cir. 2006) ................................................................55

*Wayne Farms, LLC.,*
No. 17-1174, 2020 WL 5815506 (OSHRC Sept. 22, 2020) ..................29

*Whirlpool Corp. v. Marshall,*
445 U.S. 1 (1980) .....................................................................................4

## Statutes

29 U.S.C. § 651(b) .......................................................................................4
29 U.S.C. § 655(c) .......................................................................................6
29 U.S.C. § 659(c) .......................................................................................5
29 U.S.C. § 659(a) ....................................................................................5, 6
29 U.S.C. § 660(a) ..................................................................................6, 21
29 U.S.C. § 660(b) .......................................................................................6
29 U.S.C. § 660(c) .....................................................................................34
29 U.S.C. § 666 ...........................................................................................5
29 U.S.C. § 666(k) .....................................................................................52
29 U.S.C. §§ 651–678 ..................................................................................3
29 U.S.C. §§ 652-66 ....................................................................................4
29 U.S.C. §§ 658-59 ....................................................................................5
29 U.S.C. §§ 659, 661 .................................................................................5

## Rules

FRE 801(d)(2)(D) ..................................................................................58, 59
FRE 804(b) .................................................................................................59

# Regulations

29 C.F.R. Part 1910..............................................................24, 33

29 C.F.R. § 1910.145(a)(1) ..............................................................7

29 C.F.R. § 1910.145(c)(3) ............................................ 6, 1, 7, 15, 22, 52

29 C.F.R. § 1910.212(a)(1)................................ 1, 6, 14, 21, 24, 32, 34, 47

29 C.F.R. §1910.212(a)(3)(ii) .................................................. 7, 24, 31, 33

29 C.F.R. §1910.212(a)(3)(iii) ......................................................7, 24, 31

29 C.F.R. § 1910.1200(f)(1)(ii) ...................................................54

29 C.F.R. §§ 1910.216(b)(1)(iii), (c)(1), (c)(2) .........................................32

29 C.F.R. §§ 1910.262(aa), (bb)(2) ............................................32

29 C.F.R. § 2200.90(f) ...............................................................6

29 C.F.R. § 2200.91(a) ...............................................................6

## Other Authorities

Delegation of Authority and Assignment of Responsibility to the
  Assistant Secretary for Occupational Safety and Health
  85 Fed. Reg. 58393 (Sept. 18, 2020) .........................................4

# STATEMENT OF THE ISSUES

I. Whether Mar-Jac Poultry MS, L.L.C. (Mar-Jac) violated the machine guarding standard, 29 C.F.R. § 1910.212(a)(1), and exposed employees to catch point and rotating parts hazards created by the Line 2 eviscerator's carousels where the manufacturer recognized these hazards, the rotating carousels were easily accessible, employees routinely dislodged material from the carousels by hand during the machine's operation, and employees rarely engaged the safety cord that hung six feet above before accessing the zone of danger.

II. Whether Mar-Jac violated the safety instruction signs standard, 29 C.F.R. § 1910.145(c)(3), and exposed employees to hazards created by the Line 2 eviscerator's rotating carousels where the company failed to post signs instructing employees to avoid the zone of danger during the machine's operation, and the manufacturer affixed these signs on a another eviscerator at the plant.

III. Whether Fifth Circuit precedent requires the Secretary to refer to industry custom to establish Mar-Jac's noncompliance where the

cited standards specify the circumstances that require Mar-Jac to

implement safety measures that protect against the hazards.

IV.   Whether Mar-Jac's violation of the safety instruction signs

standard is properly characterized as serious where Mar-Jac

failed to post signs instructing employees to avoid the Line 2

eviscerator's zone of danger, employees routinely dislodged

material from the carousels by hand during the machine's

operation, and a Mar-Jac employee died from being caught in the

carousels.

V.   Whether Mar-Jac failed to establish the affirmative defense of

unpreventable employee misconduct where employees and

supervisors flagrantly disregarded a work rule prohibiting them

from reaching into the eviscerator while it is operating without

facing any discipline and where the violative conditions existed

independent of employees' noncompliance with the work rule.

# STATEMENT OF THE CASE

## I.   Procedural History

On June 1, 2021, Occupational Safety and Health Administration (OSHA) Compliance Safety and Health Officers (CSHOs) Patrick Whavers[1] and Jermaine Davis inspected Mar-Jac's poultry processing plant in Hattiesburg, Mississippi after an employee was caught in an eviscerator and died. Dec. 1; Tr. 104.[2]  OSHA issued a two-item citation to Mar-Jac alleging serious violations of the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651–678 (OSH Act). Vol. 3(2), as amended upon the Secretary's motion, Dec. 1-2 (citing Vol. 4(3) at 1-2; Vol. 4(33)).  Mar-Jac contested the citation, and following a hearing, Occupational Safety and Health Review Commission (Commission) Administrative Law Judge (ALJ) Sharon D. Calhoun affirmed OSHA's

---

[1] At the time of the hearing, CSHO Whavers had retired and did not appear. Tr. 102:22-25. However, CSHO Davis accompanied Mr. Whaver during the inspection, and testified on OSHA's behalf. Tr. 102:7-18

[2] The Secretary cites and abbreviates the following documents from the Commission's certified list, filed on February 16, 2024, as follows: Hearing Transcript, Volume 1 (Tr. [Page #: Line#]) ; Secretary's Exhibits, Volume 2 (Ex. C-[#] at [pg. #]); Mar-Jac's Exhibits, Volume 2 (Ex. R- [#] at [bates #]); ALJ Decision, Volume 4, Item 38 (Dec. [pg. #]). The Secretary cites all other documents in the certified list using the format Vol.[#]([Item #]). The Secretary cites Mar Jac's opening brief as "Pet. Br. [#]" and will refer to photographic evidence incorporated in the brief as "Fig. [#]" followed by an in-text or footnoted record citation.

citation on September 22, 2023. Dec. 1-2, 23. The Commission denied Mar-Jac's petition for review, and the ALJ's decision became the Commission's final order on November 20, 2023. Vol.4 (41). Mar-Jac subsequently petitioned this Court to review the Commission's final order.

## II.    Statutory and Regulatory Background

Congress enacted the OSH Act "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b). The Act seeks to prevent occupational injuries and deaths. *Whirlpool Corp. v. Marshall*, 445 U.S. 1, 13 (1980). To achieve that goal, the OSH Act authorizes the Secretary of Labor to promulgate mandatory occupational safety and health standards and requires employers to comply with those standards. 29 U.S.C. §§ 652-66.

The Secretary, through OSHA,[3]  prosecutes violations of the OSH Act by issuing citations to employers requiring abatement and, where

---

[3] With limited exceptions not relevant here, the Secretary has delegated her authority and responsibilities under the OSH Act to the Assistant Secretary for Occupational Safety and Health, who heads OSHA. Delegation of Authority and Assignment of Responsibility to the Assistant Secretary for Occupational Safety and

appropriate, by assessing monetary penalties. 29 U.S.C. §§ 658-59, 666. OSHA characterizes violations as willful, repeat, serious, or other-than-serious, which affects the maximum penalty that OSHA can assess for the violation. *Id.* at § 666(a)-(c). A "serious violation" exists "if there is a substantial probability that death or serious physical harm could result" from a condition or practice "unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation." *Id.* at § 666(k).

Employers may contest OSHA citations before the Commission, an independent tribunal not within the Department of Labor or otherwise under the direction of the Secretary. *Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144, 147-48 (1991); *see also* 29 U.S.C. §§ 659, 661. If the employer timely contests a citation or penalty, the Commission must "afford an opportunity for a hearing," and "thereafter issue an order, based on findings of fact, affirming, modifying, or vacating the Secretary's citation or proposed penalty." 29 U.S.C. § 659(a), (c). A Commission-appointed ALJ presides over the hearing and

---

Health, 85 Fed. Reg. 58393 (Sept. 18, 2020). The Secretary uses the terms "Secretary" and "OSHA" interchangeably in this brief.

issues a decision. *Id.* at §§ 659(c), 661(j). The Commission may grant or deny review of the ALJ's decision. *Id.*; 29 C.F.R. § 2200.91(a). When the Commission declines to review an ALJ's decision within thirty days of docketing, the decision becomes the Commission's final order by operation of law. 29 U.S.C. § 655(c); 29 C.F.R. § 2200.90(f). Any aggrieved party may seek judicial review of a Commission final order in the appropriate U. S. Court of Appeals. 29 U.S.C. § 660(a)-(b).

OSHA cited Mar-Jac for violating the machine guarding standard, 29 C.F.R. § 1910.212(a)(1), and the safety instruction signs standard, 29 C.F.R. § 1910.145(c)(3). Vol. 3(2), as amended, Dec. 1-2 (citing Vol. 4(3) at 1-2; Vol. 4(33)).

The machine guarding standard requires employers to provide "[o]ne or more methods of machine guarding . . . to protect the operator and other employees in the machine area from hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks." 29 C.F.R. § 1910.212(a)(1). The "[p]oint of operation is the area on a machine where work is actually performed upon the material being processed." *Id.* at § 1910.212(a)(3)(i). The guarding device must conform with "any appropriate standards" and "in the

absence of applicable specific standards," the guarding device must be designed and constructed "to prevent the operator from having any part of his body in the danger zone during the operating cycle." *Id.* at §1910.212(a)(3)(ii). Further, "special hand tools for placing and removing material shall . . . permit easy handling of material without the operator placing a hand in the danger zone" and employers must not use these tools instead of the guarding required by the standard. *Id.* at § 1910.212(a)(3)(iii).

In relevant part, the safety instruction signs standard applies to signs that intend to indicate and define "specific hazards" that may lead to accidental injury or death to workers. *Id.* at § 1910.145(a)(1). This standard requires employers to use safety signs "where there is a need for general instructions and suggestions relative to safety measures." *Id.* at § 1910.145(c)(3).

## III. Statement of Facts

### A. Mar-Jac's Poultry Processing Plant Operations.

Mar-Jac operates two Meyn Maestro eviscerators on Lines 1 and 2 at its Hattiesburg poultry processing plant. Dec. 3. Both machines perform the same poultry evisceration functions, as each machine has two rotating carousels that work to remove various innards from the bird's cavity and deposit them into cups. Dec. 3; Tr. 130:23-25, 131:1. The carousels have a six to seven-inch gap between them. Dec. 3; Tr. 77:19-25, 78:1-6. On the first carousel, the birds are shackled upside down by the legs (*see* Fig. 1 at 9)—while the bird moves downward, metal spoons move upward to dislodge the bird's innards. Dec.3; Tr. 63:4-20 (describing the parts that hold the bird in place, as depicted in Ex. C-5, *see* Fig. 3 at 11); Tr. 65:10-25, 66:1-19 (describing moving machinery parts). A blade then cuts the innards from each bird, and the machine deposits the usable innards in cups located on the second rotating carousel while the remaining parts fall to the metal pan below the carousel for disposal. Dec. 3.



**Fig. 1 Carousels with Shackled Birds and Dangling Innards.**[4]

The eviscerators run automatically and the carousels rotate clockwise at an accelerated pace of 174 birds per minute—approximately 21% faster than a typical processing facility (144 birds per minute). Dec. 3; Tr. 72:20-25. At times, the discarded innards become entangled in the machines parts and birds get stuck on the carousel. Dec. 4-5; Tr. 33 – 36:1-11, 68-71.

Meyn, the manufacturer, installed the Line 1 eviscerator in November 2014—nine months after it installed the Line 2 eviscerator in February 2014. Tr. 133:15-25, 134:1-11. These machines are in the same room at the plant. Tr. 105. On the Line 1 eviscerator, Meyn installed metal doors that enclose the machine's rotating carousels. Dec

---

[4] Ex. R-1 at 584.

3; Tr. 134:3-11; Ex. R-2 at 578. Meyn also affixed two safety decals on the doors that read "DANGER: WATCH YOUR HANDS AND FINGERS" and "DANGER! Pinch Point: KEEP HANDS CLEAR WHILE MACHINE IS OPERATING: Will result in serious injury" with symbols depicting finger amputation and a hand caught in between two rotating parts (*see* Fig. 2 below). *Id.*



**Fig. 2. Line 1 Eviscerator with Safety Doors and Decals[5]**

The Line 2 eviscerator, however, did not have safety doors or decals, leaving the rotating parts open and easily accessible to employees (*see* Figs. 3 and 4 below). Dec. 3; Exs. C-5, C-6; Tr. 94:21-25 – 96:1-5 (describing various rotating parts within reach), 105; 134:3-11.

---

[5] Ex. R-2 at 578.

 

**Fig. 3 Open Parts A[6]**    **Fig. 4 Open Parts B[7]**

Meyn's operation manual for the Maestro eviscerator warns about various hazards associated with the machine's rotating parts. To ensure safety during operation, Meyn advises users to "[e]nsure that no persons are on top, inside, or under the machine while in use" and to "[k]eep all safety guards and doors closed." Tr. 212-215:1-10. Meyn equipped both eviscerators with a red emergency stop button and a red safety cord that wraps around the machine. Dec.3; Tr. 42, 46, 72, 90. When engaged, both mechanisms immediately stop the machine's evisceration process. *Id*. On and before the May 2021 fatal incident, the safety cord on the Line 2 eviscerator hung six feet above the floor near the top of the machine. Dec. 4; Tr. 42-43:1, 158:20-25. After the fatal

---

[6] Ex. C-5; Tr. 52 (employees work on this side of the machine).
[7] Ex. C-6.

incident, Mar-Jac lowered the cord, which now hangs eighteen inches above the metal pan (approximately chest height for a six-foot-one inch person), as shown in Fig. 3 and 4 above. Dec. 4; Tr. 42-43; Ex. R-1 at 587, 612-613; *supra* at 11.

The area around the eviscerator can get particularly messy, especially on Line 2. Dec. 4; Tr. 68-70, 139. Mar-Jac's floor personnel are responsible for keeping the eviscerator area clean while the machines are operating, and sanitation personnel deep clean the eviscerators on a separate shift when they are not operating. Dec. 4; Tr. 33-38, 68-70, 138-40.  The floor persons have squeegees, hoses, and poles with hooks to perform their cleaning duties. Dec. 4; Tr. 69, 137-139.  Two consumer safety inspectors from the U.S. Department of Agriculture (USDA) Food Safety and Inspection Service work alongside Mar-Jac employees on the evisceration lines. Dec. 4; Tr. 30, 52, 60. Supervisors, including Mar-Jac's human resources (HR) manager, also work on the plant floor and conduct walkthroughs. Tr. 69:12-17, 71, 131:19-25, 132:1-11. While the eviscerators are operating, Mar-Jac

employees (including supervisors)[8] routinely reach their hands near the rotating carousels to remove entangled innards that wrap around the machine's parts (*see* Figs. 1 and 2 at 9-10). Dec. 4; Tr. 36:1-11, 68-71, 212:1-4, 162:16-25, 163:1-5; Ex C-10 at 1-2. Employees also removed stuck birds from the carousels by hand while the machine is operating. Dec. 4-5; Tr. 36:1-11, 69-71.

Stuck birds can cause the machine to misfeed the poultry. *Id.* A misfeed derails the machine's entire evisceration process so employees must promptly remove stuck birds for the machine to process poultry properly. Tr. 33, 34, 35:1-9, 69:1-17, 69:19-25, 70:1-8, 71, 76:14-25; Ex. C-5 (*see* Fig. 3 *supra* at 11). Employees rarely used the emergency stop button or safety cord to stop the evisceration process before reaching in the machine. Tr. 40:22 – 41:15. Mar-Jac has never disciplined employees for reaching into the eviscerator with their hands while the machine was operating. Dec. 6; Tr. 163:13-23.

---

[8] You can easily identify supervisors on the plant floor by their blue coats. Dec. 5, n.2; Tr. 32:18-21, 60:9-22

**B. A Mar-Jac Employee is Caught in an Eviscerator and Dies.**

On May 31, 2021, B.B. was working as a floor person near the Line 2 eviscerator, although he usually works in another area of the plant. Dec. 4; Ex. C-10 at 1:5-11. Another floor person, J.C., worked near the Line 1 eviscerator. Ex. C-10. USDA Inspector 1, who was also working that night, saw B.B. reaching into the Line 2 eviscerator "pulling out guts and birds," although no one witnessed the fatal incident. Dec. 4, Tr. 37-38. The inspector was in the breakroom when she "heard hollering" near the eviscerator, stepped out and saw B.B.'s feet and body "hung up in the machine." Dec. 4., Tr. 39. USDA Inspector 2 also saw B.B.'s body caught between the machine's rotating carousels. Tr. 74:17-18, 75–76:1-17, 77:1-19. A state medical examiner determined that blunt force injuries caused B.B.'s death. Dec. 4; Ex. R-14. A toxicology report was positive for drugs and alcohol. Dec. 4; Ex. R-15; Tr. 152:24-25, 153:1-2, 153:10-14.

**C. The ALJ Affirms OSHA's Two-Item Citation Alleging Serious Violations of the Machine Guarding and Safety Instruction Signs Standards.**

On November 22, 2021, OSHA issued a citation to Mar-Jac alleging serious violations of the machine guarding standard, 29 C.F.R.

§ 1910.212(a)(1), and the safety instruction signs standard, 29 C.F.R. §

1910.145(c)(3). Vol. 3(2), as amended, Dec. 1-2 (citing Vol. 4(3) at 1-2;

Vol. 4(33)); Tr. 114:15 – 117. The ALJ agreed with the parties'

stipulations that the cited standards applied to Mar-Jac. Dec. 8, 15; Vol.

4 (29) at 6. When affirming OSHA's citation, the ALJ found that the

Secretary proved *prima facie* violations and Mar-Jac failed to prove the

affirmative defense of unpreventable employee misconduct. Dec. 7-23.

For the machine guarding violation, the ALJ found that "the Line

2 eviscerator's rotating carousels and speed at which the machine

operated presented a hazard to Mar-Jac employees." Dec. 9-10. The ALJ

noted that in addition to the manufacturer's warnings, Mar-Jac

"recognize[d] that cleaning chicken parts from a Meyn Maestro

Eviscerator while the machine is operating creates a risk of catch

point/rotating parts hazard[s]." Dec. 10; Ex. C-1 at 1. Although the

Secretary argued that the zone of danger included the entire open space

between the pan and the carousels, the ALJ limited the zone of danger

to the area surrounding the rotating carousels. Dec. 10-11.

Applying this Court's analysis in *Southern Hens, Inc. v.

Commission*, 930 F.3d 667 (5th Cir. 2019), the ALJ further found that

employee exposure to the hazard was reasonably predictable. The ALJ relied on credible testimony from two USDA inspectors, as corroborated by Mar-Jac floor person J.C's statement, establishing that floor persons routinely reached into the zone of danger to remove entangled innards and stuck birds from the eviscerator's carousels by hand while it was operating. Dec. 11-12. The ALJ found that the safety cord was not a sufficient guard because it hung six feet above the ground at the time of the incident and the cord's height allowed employees to easily bypass it to access the zone of danger. Dec. 12. The ALJ also found that B.B.'s injuries and death established actual exposure to the hazard. Dec. 13.

Regarding the safety instruction signs violation, the ALJ found it was unreasonable for Mar-Jac to post signs on the Line 1 eviscerator and not Line 2 because the manufacturer recognized the hazards associated with both machines, which establishes industry practice. Dec. 17. The ALJ explained that the manufacturer posted safety decals for the same hazard on the same machine, which operated in the same way and was in the same facility. *Id.* Therefore, the ALJ found Mar-Jac's failure to post safety signs on the Line 2 eviscerator was unreasonable. *Id.*

Relying on Commission precedent, the ALJ also found that OSHA properly characterized the safety instruction signs violation as serious. Dec. 21. The ALJ explained that the Secretary established a "direct and immediate relationship" between the violative condition—lack of a safety instruction sign—and occupational safety. *Id*. The ALJ further explained that "[d]eath or serious harm would result from Mar-Jac's failure to have and enforce a safety sign or instruction warning employees against placing their hands in the zone of danger," as is evident by B.B.'s death in this case. *Id*.

Regarding employer knowledge, the ALJ found Mar-Jac had actual knowledge of the physical conditions constituting the violation because "the conditions [were] in the open, plainly visible to anyone walking by." Dec.13-14 (citing *S. Hens*, 930 F.3d at 676). The ALJ further found that Mar-Jac had constructive knowledge of the cited violations because employees and supervisors routinely placed their hands in the zone of danger to remove entangled innards and birds from the machine's parts, and Mar-Jac failed to take reasonable steps to discover this pervasive practice. Dec. 14, 18.

The ALJ found that Mar-Jac failed to prove the affirmative defense of unpreventable employee misconduct. Dec. 10-12. The ALJ acknowledged that Mar-Jac established a work rule forbidding employees from reaching into the eviscerator. Dec 19. The ALJ, however, found that Mar-Jac failed to prove it adequately communicated this rule to employees, took reasonable steps to discover violations of this rule, and effectively enforced this rule because "[it] was so flagrantly violated by both supervisors and employees." Dec. 19. The ALJ rejected Mar-Jac's argument that B.B.'s intoxication amounted to unpreventable employee misconduct because how employees interacted with the hazardous condition rather than B.B.'s conduct was probative. The ALJ explained that there was no evidence that other employees who placed their hands in the zone of danger only did so because they were intoxicated. *Id.* Therefore, the ALJ affirmed OSHA's citation.

## SUMMARY OF THE ARGUMENT

The ALJ correctly concluded that Mar-Jac violated OSHA's machine guarding and safety instruction signs standards. Mar-Jac failed to physically guard the Line 2 eviscerator's carousels, exposing

employees to catch point and rotating parts hazards. Employees and supervisors routinely bypassed the eviscerator's safety mechanisms to access the zone of danger to remove material from the carousels by hand while the machine was operating. Therefore, Mar-Jac's guarding methods provided inadequate protection against the hazards and did not meet the standard's requirements.

Mar-Jac also failed to post safety signs on the Line 2 eviscerator instructing employees to avoid placing their hands in the zone of danger during the machine's operation, similarly exposing employees to hazards. The physical conditions constituting both violations were open and obvious, establishing Mar-Jac's knowledge of the violations.

Because the cited standards specify the circumstances that required Mar-Jac to implement safety measures, the Secretary was not required to refer to industry custom to establish the violations or to establish adequate notice of the standards' requirements. Regardless, the machine's manufacturer recognized the associated hazards, which is evidence of industry custom. Accordingly, Mar-Jac's noncompliance with the cited standards was unreasonable. The ALJ also correctly characterized the safety instruction signs violation as serious because

Mar-Jac's failure to post safety signs on the Line 2 eviscerator could cause death or serious physical injury and did.

Finally, Mar-Jac failed to prove the affirmative defense of unpreventable employee misconduct because Mar-Jac cannot establish that employees' failure to comply with its work rule caused the violative conditions—the unguarded eviscerator that lacked safety instruction signs. Moreover, Mar-Jac did not effectively enforce its work rule prohibiting employees from reaching into the eviscerator while it was operating, and employees flagrantly violated this work rule. Because the ALJ correctly found that Mar-Jac employees routinely accessed the zone of danger without facing any discipline, Mar-Jac cannot establish that the company's safety program was adequate to prevent the violations.

Therefore, the ALJ properly affirmed OSHA's citation.

## ARGUMENT

### I. Standard of Review

The Court must uphold the ALJ's findings of fact if they are "supported by substantial evidence on the record considered as a

whole."[9] 29 U.S.C. § 660(a); *Phoenix Roofing, Inc. v. Dole*, 874 F.2d 1027, 1029 (5th Cir. 1989). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619–20 (1966) (internal quotation marks omitted); *see also Trinity Marine Nashville, Inc. v. Occupational Safety & Health Rev. Comm'n*, 275 F.3d 423, 426–27 (5th Cir. 2001) (where there is substantial evidence, the Court is bound by findings of fact even if it "could justifiably reach a different result de novo"). The Court "will not reweigh the evidence or independently evaluate evidentiary conflicts." *Phoenix Roofing*, 874 F.2d at 1029. The Court also will uphold the ALJ's legal conclusions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Trinity Marine Nashville*, 275 F.3d at 426-27.

## II. The ALJ Correctly Determined that Mar-Jac Violated the Machine Guarding Standard, 29 C.F.R. § 1910.212(a)(1), and the Safety Instruction Signs Standard, 29 C.F.R. § 1910.145(c)(3).

---

[9] The Court applies the same standard of review to an unreviewed ALJ decision as it does to Commission decisions. *Echo Powerline, L.L.C. v. Commission*, 968 F.3d 471, 476 (5th Cir. 2020) (internal citations omitted).

Substantial evidence supports *prima facie* violations of the cited machine guarding and safety instruction sign standards. Dec. 2-23. To establish a prima facie violation of an OSHA standard, the Secretary must prove: (1) the cited standard applies to the cited condition, (2) the employer failed to meet the standard's requirements, (3) employees had access to the violative condition, and (4) the employer knew or could have known of the violative condition with the exercise of reasonable diligence. *Sanderson Farms v. Perez*, 811 F.3d 730, 735 (5th Cir. 2016). The ALJ found that the Secretary proved all four elements when affirming OSHA's citation. Dec. 7-18. Of these elements, Mar-Jac disputes the company's noncompliance with the cited standards, employee exposure to hazards, and employer knowledge for both violations.[10] Mar-Jac also disputes that the safety instruction signs standard applies on appeal.

### A. Mar-Jac Violated Section 1910.212(a)(1) When It Failed to Physically Guard the Catch Point and Rotating Parts Hazards Posed by the Line 2 Eviscerator's Carousels.

---

[10] The Secretary addresses the knowledge element for both violations in Argument II. C. *infra* at 38-42.

The ALJ correctly found that the Line 2 eviscerator's carousels presented catch point and rotating parts hazards, Mar-Jac routinely exposed employees to those hazards, Mar-Jac's machine guarding methods were inadequate to protect employees from those hazards, and Mar-Jac had knowledge of the violative conditions. Dec. 8-15; Vol. 4 (30) at 2 (Citation 1, Item 1).

OSHA promulgated the machine guarding standard to protect employees from human error, such as "neglect, distraction, inattention or inadvertence." *Slyter Chair, Inc.*, No. 1263, 1976 WL 5947, at *2 (OSHRC Apr. 8, 1976). As the Commission has long recognized, the standard "implicitly recognizes that human characteristics such as skill, intelligence, carelessness, and fatigue, along with many other qualities play a part in an individual's job performance, and it avoids dependence on human conduct for safety." *B.C. Crocker*, No. 4387, 1976 WL 6125, at *2 (OSHRC Oct. 13, 1976); *see also S. Hens, Inc.*, 930 F.3d at 677-78 ("Occupational safety regulations exist because people are distractible. Functioning with less than perfect focus and control is our ordinary condition.").

Accordingly, section 1910.212(a)(1) requires employers to physically guard the hazards covered in this section. *S. Hens, Inc.*, 930 F.3d at 680 (citing *B.C. Crocker*, No. 4387, 1976 WL 6125 at *2 (OSHRC Oct. 13, 1976)). In doing so, the employer's guarding methods must conform with "standards either published or incorporated by reference in 29 C.F.R. Part 1910." *Stacey Mfg. Co., Inc.*, No. 76–1656, 1982 WL 22594, at *4 (OSHRC Mar. 23, 1982) (defining "appropriate standards" within 29 C.F.R. § 1910.212(a)(3)(ii)) (internal citation omitted). Where there is not an applicable OSHA standard, the employer's guarding method **must prevent entry into the hazardous area to satisfy the standard's requirements**. *See* 29 C.F.R. § 1910. 212(a)(3)(ii) (emphasis added). And hand tools may supplement but cannot replace the physical guarding that the standard requires. *Id.* at § 1910.212(a)(3)(iii).

### 1. The Eviscerator's Carousels Required Guarding Because Employees Routinely Accessed the Zone of Danger to Remove Material by Hand.

The ALJ correctly found that Mar-Jac was required to guard the Line 2 eviscerator's carousels to protect employees from catch point and rotating parts hazards because employees were routinely exposed to

these hazards when removing material from the carousels by hand while the machine was operating. Dec. 8-15.

To determine whether employers are required to implement machine guarding to protect employees from such hazards, the court considers how the machine functions and how employees use the machine. *Aerospace Testing Alliance*, No. 16-1167, 2020 WL 5815499, at *4 (OSHRC Sept. 21, 2020). To prove the employer did not comply with the machine guarding standard, the evidence "must show that it is reasonably predictable either by operational necessity or otherwise (including inadvertence), that employees have been, are, or will be in the zone of danger." *Id.* (quoting *Fabricated Metal Prods.*, No. 93-1853, 1997 WL 694096, *3-*4 (OSHRC Nov. 7, 1997)); *see also S. Hens, Inc.*, 930 F.3d at 681 (adopting the Commission's longstanding standard in *Fabricated Metal*, 1997 WL 694096 for determining employee exposure).

When concluding Mar-Jac failed to comply with the standard, the ALJ correctly found that "the Line 2 eviscerator's rotating carousels and speed at which the machine operated presented a hazard to Mar-Jac employees." Dec. 9; Tr. 72; Ex. R-2 at 578; C-1 at 1; Tr. 212-215:1-10. Importantly, both the manufacturer and Mar-Jac recognized that the

eviscerator's carousels presented catch point and rotating parts hazards. Meyn acknowledged these hazards in the safety decals affixed to the Line 1 eviscerator and the operation manual similarly identified these hazards and required protective measures. Dec. 9-10 (citing *Henkel's McCoy, Inc.*, No. 18-1864, 2022 WL 3012701, at *3 (OSHRC July 21, 2022)) to find the manufacturer's safety decals provide evidence that the hazard exists); Ex. R-2 at 578 (see Figs. 3 and 4 supra at # identifying caught in and rotating parts hazards); Tr. 212-215:1-10 (operation manual). And Mar-Jac conceded in discovery that "cleaning chicken parts from a Meyn Maestro Eviscerator while the machine is operating creates a risk of catch point / rotating parts hazard" Dec. 10; Ex. C-1 at 1.

The ALJ also correctly found that the zone of danger encompassed "the area surrounding the carousel, where the rotating parts and associated caught in hazards are present"[11] and that Mar-Jac employees routinely accessed the zone of danger while working.[12] Dec.

---

[11] The Secretary addresses Mar-Jac's argument that the ALJ abused her discretion when determining the zone of danger in Argument II.A.3. *infra* at 35-37.

[12] The ALJ found employee exposure to establish Mar-Jac's noncompliance with the cited machine guarding standard and the third element of the Secretary's prima

11. When determining employee exposure, the ALJ found this Court's decision in *Southern Hens, Inc.*, 930 F.3d 667 (5th Cir. 2019), instructive because the employer in that case also violated the same machine guarding standard, and like the employees in that case, Mar-Jac's "floor persons frequently cleaned the zone of danger" and used their hands to remove material from the machine's carousels that the provided tools could not remove. Dec.12; Tr. 36:1-11, 68-71, 212:1-4, 162:16-25, 163:1-5; Ex C-10 at 1-2.

In *Southern Hens*, OSHA inspected a poultry processing plant with two parallel conveyor lines—one guarded and one not. 930 F.3d at 673-74. OSHA cited the employer for violating the machine guarding standard after a CSHO observed an employee working to unclog an area on the unguarded line using his hands rather than a metal tool the employer provided. *Id.* at 672. Like the ALJ found here, the ALJ in *Southern Hens* found that the conveyor line had an ingoing nip point that was not covered by a physical guard[13] and it was reasonably predictable that employees would access the zone of danger to perform

_____

facie case. Dec. 13 ("B.B.'s accident, injuries, and death establish actual exposure" in addition to the noncompliance discussion).
[13] As discussed in Argument II.A.2. *infra* at 29-35.

work duties. *Id.* at 674. The ALJ in *Southern Hens* rejected the employer's arguments that the conveyor's operation and provision of a tool made the likelihood of injury remote. *Id.*

When denying the employer's petition for review, this Court held there was "operational necessity" to establish employee exposure where jams frequently occurred on the conveyor, the employee had to clear them, and the tool was ill-suited for the task. *Id.* at 680. Likewise, here the ALJ found substantial evidence showing that it was necessary for Mar-Jac employees to access the zone of danger to support the plant's evisceration process, and Mar-Jac's provision of tools did not prevent employee exposure. Dec. 12; Tr. 36:1-11, 69-71; Ex. C-10 at 1-2.

For instance, USDA inspectors indicated "both supervisors and floor persons, reach[] into the operating eviscerator to pull out [material] hanging from or wrapped around the carousel and guide bar, as well as chickens stuck in the machines." Dec. 11; Tr. 36:1-11, 69-71. And floor person J.C.'s statement corroborated "this cleaning practice [while the machine was operating], which brought employees within the zone of danger because their hands, arms, and clothing were near the screw coming up from the pan to the carousel and the carousel itself."

Dec. 11 (citing Ex. C-10 at 1-2). As the ALJ noted, floor person J.C. was trained to put his hand in the machine, expected to remove some remains by hand, and the machine caught his coat sleeve at times when he reached in near the carousel to perform that task. Dec. 11-12 (citing Ex. C-10 at 1-3).

Moreover, as the ALJ acknowledged this "practice was not infrequent; it was pervasive." Dec. 18; *cf. Wayne Farms, LLC.*, No. 17-1174, 2020 WL 5815506, at *4 (OSHRC Sept. 22, 2020) (finding employee exposure was not reasonably predicable where an employee's act of reaching into the machine "was the intentional, idiosyncratic behavior of only one employee" because no other employees regularly engaged in this practice). Therefore, the ALJ not only correctly found that the Line 2 eviscerator's carousels presented catch point and rotating parts hazards that required guarding, but also that Mar-Jac routinely exposed employees to these hazards. Accordingly, Mar-Jac's argument that "there was no known hazard" should be rejected. Pet. Br. 13-18, 21.

> ### 2. The Safety Cord, Emergency Stop Button, Tools, and Work Rules Did Not Satisfy the Standard's Guarding Requirements.

As discussed above, the machine guarding standard requires the employer to physically guard hazards, guarding methods must prevent employees from entering the zone of danger, and tools and work rules may supplement but do not replace physical guards. *See* Argument II.A. *supra* at 23-24. Where employees habitually access the zone of danger despite an employer's safety measures, the guarding method(s) will not satisfy the standard's requirements. *See Akron Brick & Block Co.*, No. 4859, 1976 WL 5896, *2-*3 (OSHRC Jan. 14, 1976) (finding a safety switch and hook in combination with a work rule did not satisfy section 1910.212(a)(1)'s requirements).

Here, the ALJ correctly concluded that the safety cord was not an acceptable method of machine guarding because the cord's height—at six feet above the floor—"allowed [employees] to easily bypass it to enter the zone of danger." Dec. 12 (citing Riverdale Mills Corp. v. Occupational Safety & Health Rev. Comm'n, 229 F. App'x 11 (1st Cir. 2002) (unpublished) (finding a trip wire, which was designed to stop machine's motion, was insufficient where it did not prevent entry into the hazardous area); 29 C.F.R. § 1910. 212(a)(3)(ii); Pet. Br. 23-24. Importantly, USDA Inspector 2 indicated that Mar-Jac did not hang the

safety cord at a reasonable height for employees to use because the cord hung over the employees' head. T. 72:12-19, 87:13-25, 88:1. And employees rarely, if ever, used the safety cord while working. Tr. 40:22-41:15.

Likewise, the emergency stop button does not satisfy the standard's requirements because employees could also easily bypass it to access the zone of danger—and did. Tr. 40:22 – 41; Ex. C-5; Pet. Br. 11, 22-23; *see* 29 C.F.R. § 1910. 212(a)(3)(ii); *Riverdale Mills Corp.*, 229 F. App'x 11 (unpublished) (a guarding method that did not prevent entry into the hazardous area does not satisfy the machine guarding standard's requirements). Additionally, the tools Mar-Jac provided floor persons (squeegees, hoses, and poles with hooks), alone, did not satisfy the standard's requirements. *See S. Hens, Inc.*, 930 F.3d at 680-81 (citing 29 C.F.R. §1910.212(a)(iii) to find that the employer's provision of tools is not sufficient); Dec. 12; Tr. 66-67; Ex. C-10 at 1-2; Pet. Br. 19-20.

Further, Mar-Jac's employee training and work rules are not physical guarding methods, and therefore also do not satisfy the standard's requirements alone or together with the safety cord and

emergency stop button. *See B.C. Crocker*, No. 4387, 1976 WL 6125 at *2;

*Akron Brick*, 1976 WL 5896, at *2  (work rules relating to the use of a

safety switch and hook were not guarding methods compliant with §

1910.212(a)(1)); Pet. Br. 10, 22, 32.

Mar-Jac erroneously relies on guarding standards specific to other

industries to argue the safety cord was an acceptable guarding method

despite its height; however, these standards do not apply to the poultry

processing industry.[14] Dec. 12; Pet. Br. 24-25. Thus, these other

industry standards are not relevant to determining whether Mar-Jac

complied with section 1910.212(a)(1)'s requirements and fail to rebut

the ALJ's findings. Notably, Mar-Jac has not identified a published

standard specific to the poultry processing industry that permits the

company's purported guarding methods, and the Secretary is not aware

of any such standard. 29 C.F.R. § 1910.212(a)(3)(ii); *see Stacey Mfg. Co.*,

Inc., 1982 WL 22594, at *4 (defining "appropriate standards" as those

"either published or incorporated by reference in 29 C.F.R. Part 1910").

---

[14] Mar-Jac cites the textile guarding standard in 29 C.F.R. §§ 1910.262(aa), (bb)(2) and the rubber and plastics guarding standard in 29 C.F.R. §§ 1910.216(b)(1)(iii), (c)(1), (c)(2). Pet. Br. 24-25.

Therefore, the ALJ correctly determined that the emergency stop button and the safety cord provided inadequate guarding protection.

Mar-Jac's view that the Secretary must demonstrate "feasible means of abatement" to prove noncompliance is also misguided. Pet. Br. 25. The Commission has long held that the Secretary is not required to prove physical machine guarding was feasible to establish an employer's noncompliance with the cited standard. *Loren Cook Co.*, No. 04-2179, 2006 WL 2180649, at \*5-\*6 (OSHRC June 19, 2006) (the employer must raise infeasibility as an affirmative defense to a section 1910.212(a)(1) violation); *accord Corbesco, Inc. v. Dole*, 926 F.2d 422, 429 (5th Cir. 1991) (the employer must raise infeasibility as an affirmative defense).

Rather, it is Mar-Jac's burden to prove that it was infeasible to physically guard the Line 2 eviscerator's carousel as an affirmative defense. *Loren Cook Co.*, 2006 WL 2180649, at \*5-\*6; *accord Corbesco, Inc.*, 926 F.2d at 429; *see also S. Hens*, 930 F.3d at 680 (employer had not shown a physical guard was infeasible where a parallel machine had greater protections). Mar-Jac has not only waived this affirmative

defense by failing to raise it before the ALJ,[15] Mar-Jac has also failed to prove that guarding the Line 2 eviscerator was infeasible on appeal. Indeed, the manufacturer itself recognized that physical guarding of the machine is feasible and necessary.[16] Tr. 212-215:1-10 (operation manual).

Lastly, the absence of prior injuries does not negate Mar-Jac's noncompliance with the standard. *S. Hens, Inc.*, 930 F.3d at 679, n. 10. As this Court acknowledged, "OSHA violations can occur without any employee injury because 'safety regulations are preventative, not reactionary and the absence of injury is not evidence of the absence of danger.'" *Id.* (citing *Sanderson Farms*, 811 F.3d at 737). Accordingly, Mar-Jac's claim that it did not expose employees working near the Line

---

[15] *See Corbesco, Inc.*, 926 F.2d at 429 (finding the employer waived its affirmative defense of infeasibility by not raising it before the reviewing court); 29 U.S.C. § 660(c) ("No objection that has not been urged before the Commission shall be considered by the court [of appeals], unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances); Vol. 4 (29) at 7; *see also* Vol. 4(36), Vol. 4 (39), Pet. Br.

[16] Neither the Secretary nor the ALJ addressed whether the doors on the Line 1 eviscerator were suitable guards under the standard as this was not an issue before the Commission. Mar-Jac misrepresents the record when stating the Commission "express[ed] a preference for the[se] doors" over other guarding methods because neither the Secretary nor the ALJ stated that the doors on the Line 1 eviscerator are the preferred guard under section 1910.212(a)(1). Pet. Br. 25-26.

2 eviscerator's carousels to hazards because "no one ha[d] ever been injured" must fail. Pet. Br. 5, 7, 20, 24. Therefore, the ALJ correctly concluded that Mar-Jac's guarding methods on the Line 2 eviscerator were inadequate and did not meet the standard's requirements.

### 3. The ALJ Did Not Abuse Her Discretion When Determining the Zone of Danger Was Near the Eviscerator's Rotating Carousels.

What constitutes the "zone of danger" is a mixed question of fact and law. The ALJ "is not limited to the particular legal theories advanced by the parties" when deciding an issue that is properly before the Commission. *Fla. Gas Contractors, Inc.*, No. 14-0948, 2019 WL 995716, at *15, n. 17 (OSHRC Feb. 21, 2019) (internal citations omitted). Instead, the ALJ retains "independent power to identify and apply the proper construction of governing law." *Id.* Accordingly, the ALJ's was not bound by the zone of danger the Secretary alleged in the citation when examining the evidence. Where substantial evidence supports the ALJ's finding and the ALJ applied the appropriate legal test—as the ALJ did here—Mar-Jac must establish that the ALJ's finding otherwise deprived the company of due process and was prejudicial to support a claim of legal error. *Cf. Dole v. Arco Chem. Co.,*

921 F.2d 484, 488 (3d Cir. 1990) (the employer is required to establish prejudice to defeat an amended complaint)

Here, the ALJ applied the appropriate legal test and determined the zone of danger based on substantial evidence as discussed above. *See* Argument II.A.1. *supra* at 24-29. Mar-Jac, however, has not established that the ALJ's finding was prejudicial. When limiting the zone of danger to "the area surrounding the [carousels'] rotating parts," the ALJ relied on facts that are no different from those underlying the Secretary's allegations. Dec. 10-11 (as discussed in Argument II.A.1. *supra* at 24-29); Tr. 114-16, 123; *cf. Arco Chem. Co.*, 921 F.2d at 488 (citing *Donovan v. Royal Logging Co.*, 645 F.2d 822, 827 (9th Cir.1981) ("when an amendment puts no different facts in issue than did the original citation, reference to an additional legal standard is not prejudicial.")).

Indeed, the Secretary identified the zone of danger as the area "below the rotating carousel of the Meyn Maestro Eviscerator" and presented evidence that Mar-Jac employees routinely removed material from the Line 2 eviscerator's carousels by hand while the machine was operating. *See* Argument II.A.1. *supra* at 24-29.  Mar-Jac was aware of

the Secretary's allegations and the company challenged the Secretary's evidence at the hearing. Dec. 10-12; Tr. 114-16, 123; Vol 4 (30) at 2; *cf. H.B. Zachry Co. v. Occupational Safety & Health Rev. Comm'n*, 638 F.2d 812, 816 (5th Cir. 1981) (finding no undue prejudice by the Secretary's amended complaint where the employer was aware of the purpose of OSHA's investigation and it was within the ALJ's discretion to allow the amendment). Because the ALJ's finding "neither surprised nor hindered" Mar-Jac's defense, Mar-Jac's claim that the ALJ abused her discretion when amending the zone of danger is unavailing. Pet. Br. 26-28; *cf. H.B. Zachry Co.*, 638 F.2d at 816 (finding the ALJ has discretion to allow an amendment to OSHA's complaint at the hearing where it would neither surprise nor hinder the employer's defense).

## B. Mar-Jac Violated Section 1910.145(c)(3) by Failing to Post Safety Signs Instructing Employees to Avoid the Line 2 Eviscerator's Danger Zone.

Mar-Jac allowed employees to place their hands below the Line 2 eviscerator's carousels to remove material, thereby exposing employees to catch point and rotating parts hazards. Yet the company did not post the safety instruction signs required by Section 1910.145(c)(3) to warn employees of these hazards. Dec. 15; Vol. 4 (30) at 2. Mar-Jac does not

dispute that the Line 2 eviscerator lacked these signs. Dec. 15; Pet. Br.

8, 18-21. And the ALJ correctly found that the employees' routine

practice of placing their hands in the zone of danger not only

established employee exposure to the hazard, but also established the

need for safety measures for the same reasons. Dec. 16; *see* Argument

II.A.1. *supra* at 24-29. Additionally, the ALJ correctly found that Mar-

Jac knew of the violative conditions. *See* Argument II. C. *infra* at 38-42.

Although Mar-Jac now argues that the standard does not apply based

on industry custom,[17] this argument fails for the reasons stated in part

II.D. below. *See infra* at 42-51. Therefore, the ALJ correctly found that

Mar-Jac violated the safety instruction signs standard.

## C. Mar-Jac Had Knowledge of the Violations Because the Eviscerator's Unguarded Condition and Lack of Safety Instruction Signs Were Open and Obvious to Supervisors in the Area.

The ALJ correctly concluded Mar-Jac had knowledge of the cited

violations because the Line 2 eviscerator's unguarded condition and

lack of safety instruction signs were openly visible to Mar-Jac's

---

[17] Mar-Jac previously stipulated that the safety instruction signs standard applied, and the ALJ agreed with the parties' stipulation. Dec. 15 (citing Vol. 4 (29) at 6).

supervisors who worked on and walked through the plant's evisceration floor. Dec. 13-15, 17-18.

To establish employer knowledge, the Secretary must show that the employer knew or should have known with the exercise of reasonable diligence of the "**physical conditions constituting the violation**, not of the specific OSHA regulation or of the probable consequences of the violation." *S. Hens, Inc.*, F.3d at 676. (internal citation omitted) (emphasis added); *see also Phoenix Roofing, Inc.,* No. 90-2148, 1995 WL 82313, at *3-4 (OSHRC Feb. 24, 1995) (explaining the Secretary is not required to show that an employer understood or acknowledged that the physical conditions were hazardous), *aff'd,* 79 F.3d 1146 (5th Cir. 1996). When examining this element, this Court engages in a "fact-specific, practical inquiry, looking to company practice, the details of specific incidents, knowledge of supervisors imputable to the company, and commonsense inferences about what a company and its supervisors should know and do." *S. Hens, Inc.,* 930 F.3d at 676. (collecting cases).

Here, the violative physical conditions were the Line 2 eviscerator's unguarded carousels that presented catch point and

rotating parts hazards and the lack of posted safety signs about those hazards. Dec. 13, 18; *S. Hens, Inc.*, F.3d at 676. As this Court found in *Southern Hens*, the knowledge issue is straightforward—"one glance at the [Line 2 eviscerator] machine would reveal it had no physical guard" nor posted safety signs and "one glance at the adjoining machine [on Line 1]" would show posting safety signs was not only possible, but required. 930 F.3d at 681-82; *see* Figs. 1-4 *supra* at 9-11. Likewise, the manufacturer's operation manual indicates that guarding the machine's rotating parts to prevent employees from contacting them was also possible and required. Tr. 212-215:1-10.

The record is replete with evidence showing these violations were open and obvious. USDA inspectors and CSHO Davis testified that the Line 1 and Line 2 eviscerators were in an open area that was visible from the plant floor. Tr. 30, 105. Further, Mar-Jac's HR manager testified that she walked the plant floor, and Mar-Jac's expert maintained that the eviscerator is a "very open piece of equipment." Dec. 14; Tr. 131:16-25, 132:1-11. The photographic evidence also shows the machine's physical condition was open and plainly visible to Mar-

Jac's supervisors working on the plant floor. Dec. 14; Tr. 131:16-25; *see* Figs.1-4 *supra* at 9-11.

Mar-Jac's claim that it did not know that OSHA standards required guarding and safety instruction signs misses the point. Pet. Br. 20, 22, 23, 25, 26. The Secretary need only prove Mar-Jac's knowledge of the "physical conditions constituting the violation[s]." *S. Hens, Inc.*, F.3d at 676. (internal citation omitted); *see also Phoenix Roofing, Inc.,* 1995 WL 82313, at *3-4 (the Secretary need not show that an employer understood or acknowledged that the physical conditions were hazardous), *aff'd, 7*9 F.3d 1146. Nevertheless, the manufacturer's operation manual warns about various hazards associated with the eviscerator's rotating parts and advises to "[k]eep all safety guards and doors closed." Tr. 212-215:1-10. And as the ALJ highlighted, the safety decals on the Line 1 machine "address the precise caught in hazard posed by the rotating carousel"—the Line 1 and Line 2 machines "operated in the same manner" and "presented the same hazard." Dec. 18; Ex. R-2 at 578; Tr. 130:23-25 – 131:1.

Therefore, the ALJ correctly found that Mar-Jac knew or should have known with the exercise of reasonable diligence that the Line 2

eviscerator was not guarded and did not display safety instruction

signs.[18] Dec. 14, 18; Pet Br. 18-21.

### D. Fifth Circuit Precedent Does Not Require Reference to Industry Custom to Establish Noncompliance with Standards that Specify the Circumstances Requiring Mar-Jac to Implement Safety Measures, and Even if It Did, Mar-Jac Had Adequate Notice.

The cited machine guarding and safety instruction standards

specify the circumstances that require Mar-Jac to guard the Line 2

eviscerator's catch point and rotating parts hazards and post safety

instruction signs to prevent employee exposure to these hazards.

Therefore, the Secretary does not need to reference industry custom to

establish that Mar-Jac violated the standards.

The Commission has held that evidence of industry custom

"should not be considered when … the standard prescribes the required

conduct in specific terms." *Cleveland Elec.*, No. 84-696, 1987 WL 89048,

at *3 (OSHRC Feb. 13, 1987). For these "specification standards," which

presume that a hazard exists and specifically state what an employer

---

[18]   The Secretary addresses Mar-Jac's argument that Fifth Circuit precedent requires the ALJ to refer to industry custom to determine whether Mar-Jac had adequate notice of the cited standards' requirements in Argument II.D.. *See infra* at 42-51.

must do to address it, adhering to industry custom has no bearing on the employer's duty to comply with the standard. *Carlisle Equip. Co. v. Sec'y*, 24 F.3d 790, 794 (6th Cir. 1994) (where the standard "prescribes the required conduct in specific terms … industry practice is inapplicable"); *see also Manson Constr.*, No. 14-0816, 2017 WL 1788442 (OSHRC ALJ Apr. 27, 2017).

At times, this Court has referred to industry custom to flesh out generally worded regulations to avoid notice problems under the due process clause. *See Echo Powerline*, 968 F.3d at 478 (examining the line of cases establishing the "industry custom" principle). This Court, however, has clarified that its precedent **does not** require the Secretary to refer to industry custom to establish noncompliance with specification standards, even when these standards contain performance-oriented elements. *Id.* Indeed, the Court has acknowledged "even where a standard is 'general' in that it applies to an entire [] industry rather than one particular segment of it," "the wording of a general standard may be precise enough to make the employer's duty clear." *Corbesco, Inc.*, 926 F.2d at 426.

In *Echo Powerline*, this Court acknowledged that "[m]any . . . if not most OSHA regulations are sufficiently specific concerning the circumstances in which safety precautions must be taken that adequacy of notice is not a significant problem." 968 F.3d at 478 (citing *S&H Riggers v. Occupational Safety & Health Rev. Comm'n*, 659 F.2d 1273, at 1280, 1285 (5th Cir. 1981)). Thus, the Court does not treat most OSHA standards as "performance standards" requiring the Secretary "to prove that the employer either failed to adhere to 'the general practice in the industry' or 'had clear actual knowledge' that the precaution in question 'was necessary under the circumstances.'" [19] *Echo Powerline*, 968 F.3d at 478 (citing *S&H Riggers*, 659 F.2d at 1280, 1285). The Court explained that in the over 40 years since it decided *B&B Insulation, Inc. v. Occupational Safety & Health Rev. Comm'n*, 583 F.2d 1364 (5th Cir. 1978), its longstanding precedent has narrowly applied the "industry custom" principle only to certain PPE provisions,

---

[19] Notably, Mar-Jac did not argue that the cited machine guarding and safety instruction sign standards were unconstitutionally vague as applied before this Court nor the Commission. Pet. Br. 1-2, 13-21; Vol. 4 (36); Vol. 4 (39). Rather, Mar-Jac argued that the Secretary failed to identify the hazard and the company lacked knowledge of the violative conditions.

and the Court has twice declined to extend this principle to other standards. *Echo Powerline*, 968 F.3d at 478 (collecting cases).

For instance, in *Brock v. City Oil Well Serv. Co.*, the Court found a standard requiring the employer to provide respirators "when such equipment is necessary to protect the health of the employee" to be "sufficiently precise," such that referring to industry custom "to avoid notice problems under the due process clause" was unnecessary. *Echo Powerline*, 968 F.3d at 478 (citing 795 F.2d 507, 511 (5th Cir. 1986)). And in *Sanderson Farms v. Occupational Safety & Health Review Comm'n*, the Court acknowledged that even though a process safety management provision was a performance standard, it declined to treat it as such because the provision prescribed specific methods and goals and was "explicit and unambiguous." *Id.* at 479 (citing 964 F.3d 418, 427-28 (5th Cir. 2020)).

Likewise, here, the machine guarding standard, section 1910.212(a)(1), is a specification standard with performance-oriented elements. Dec. 12 (quoting *Ladish Co.*, No. 78-1384, 1981 WL 18933, *4 (OSHRC 1981) ("§1910.212(a)(1) is specific in its requirements" and "a reference to industry custom and practice is unnecessary")). Other

courts have held that this standard is sufficiently specific as applied in similar situations and does not require reference to industry custom or practice to establish noncompliance. *See, e.g., Faultless Div., Bliss & Laughlin Indus., Inc. v. Sec'y of Lab.*, 674 F.2d 1177, 1187 (7th Cir. 1982) (the machine guarding regulation "is sufficiently specific as to the machines affected and as to the methods of compliance to reasonably apprise Faultless in clear terms that its presses must be guarded."); *A. E. Burgess Leather Co. v. Occupational Safety & Health Rev. Comm'n,* 576 F.2d 948, 951 (1st Cir. 1978) (finding that §1910.212(a)(1) "lacks the generality that required the narrowing construction applied [to PPE standard, section 1910.132(a)] in *Cape & Vineyard* [*Div. of New Bedford Gas v. Occupational Safety & Health Rev. Comm'n*, 512 F.2d 1148 (1st Cir. 1975)]")).

Indeed, the machine guarding standard specifically requires employers to use physical guards to protect employees from hazards created by a machine's point of operation, ingoing nip points, and rotating parts. 29 C.F.R. § 1910. 212(a)(1). It presumes a hazard exists when these areas are unguarded and the operator or others work in the machine area. *Id.*; *see Amforge Div., Rockwell Int'l*, No. 76–3488, 1980

WL 10594, at *2 (OSHRC May 6, 1980)(noting the machine guarding standard presumes a hazard exists where there is an unguarded machine and the evidence establishes employee exposure that may cause injury). And the standard provides several examples of guarding methods. *Id*. The standard is partly performance-oriented because the employer has some discretion to select the type of guard it will use. However, the employer does not have unfettered discretion because the standard requires the guarding device to be "designed and constructed as to prevent the operator from having any part of his body in the danger zone during the operating cycle." *Id*. at § 1910.212(a)(3)(ii).

Similarly, the safety instruction signs standard, section 1910.145(c)(3), is a specification standard with performance-oriented elements. The standard's scope provision states this requirement applies to signs that intend to indicate and define "specific hazards" of a nature that may lead to accidental injury or death. *Id*. at § 1910.145(a)(1). And the standard presumes that an employer's failure to post safety instruction signs "where there is a need for general instructions and suggestions relative to safety measures" creates a hazard. *Id*. at 1910.145(c)(3). The standard is partly performance-

oriented because the employer has some discretion to determine the content of safety instruction signs. The standard does not, however, allow the employer to forgo posting safety instruction signs where machinery poses a serious safety hazard to employees.

Here, the catch point and rotating parts hazards created by the Line 2 eviscerator's carousels are the specific hazards the standard intends to protect against. Dec. 16; Ex R-2 at 578. Given that Mar-Jac's employees routinely removed material from the eviscerator's rotating carousels by hand while the machine was operating and easily bypassed the eviscerator's safety mechanisms, there was clearly a need for Mar-Jac to post safety instruction signs to avoid accidental injury. Dec. 16-17; *see* Argument II.A.1. *supra* at 24-29.

Thus, as the Court found in *Brock* and *Sanderson Farms*, the cited standards are precise as applied, and the Fifth Circuit's "industry custom" principle is inapplicable. *Echo Powerline*, 968 F.3d at 478-79; *see Brock*, 795 F.2d at 511 and *Sanderson Farms*, 964 F.3d at 427-28 (discussed *supra* at 45).

Even if the Court were to require the Secretary to reference industry custom to establish that Mar-Jac had notice of the standards'

requirements, the manufacturer's recognition of the hazards and required safety measures reflects industry custom to provide adequate notice. This Court has stated "[t]he touchstone for sufficiency of notice under the due process clause is reasonableness," and an employer cannot be cited for a hazard "if a reasonable person in the employer's position would not have recognized that a hazard exists." *Corbesco*, 926 F.2d at 426. When considering reasonableness, the court examines the standard's language "in the light of [the employer's] conduct" *Id.* at 427; *see also Gold Kist, Inc.*, No. 76–2049, 1979 WL 8519, at *6 (OSHRC Oct. 31, 1979) (the Commission considers the employer's conduct "in light of the factual circumstances" presented).

Aside from the cited standards' specificity, the ALJ found that Mar-Jac acted unreasonably when failing to guard the Line 2 eviscerator's rotating carousels and post safety signs because the manufacturer recognized that these safety measures were necessary. Dec. 16-17; Tr. 212 – 215:1-10 (operation manual); Ex. R-2 at 578 (Line 1 safety signs). Because the manufacturer recognized the hazards associated with the eviscerator's rotating carousels and affixed safety decals instructing users to avoid such hazards, a reasonable person in

the Mar-Jac's position would have also recognized the hazards and implemented safety measures. *Corbesco, Inc.*, 926 F.2d at 426-27; *see also Gold Kist*, 1979 WL 8519, at *6.

Mar-Jac has not identified evidence that it is industry custom to forgo guarding the Meyn Maestro eviscerator's carousels or posting safety instruction signs on the machine (other than its own failures), and the vaguely defined customs purported by Mar-Jac's expert do not relieve Mar-Jac of its duty to comply with the cited standards. *See* Tr.183:7-14 (suggesting there was no need for signs based on industry custom); Tr. 191:-21 (suggesting the stop cord's height was acceptable in the industry); *cf. Brock*, 795 F.2d at 511 ("City cannot use industry custom to shift its statutory responsibility for the health and safety of its employees to third parties" especially when it is "vaguely defined"). Moreover, OSHA's citation in this case is consistent with the regulatory language, and Mar-Jac has not identified any official OSHA guidance asserting the safety instruction signs standard narrowly applies to "latent safety related issues". *Cf. Trinity Marine Nashville*, 275 F.3d at 429 (court considers whether the Secretary's interpretation is consistent

with the regulatory language and whether a formal agency interpretation deprived the employer of adequate notice); Pet. Br. 20.

OSHA's citations for violating the safety instruction signs standard in other cases do not support Mar-Jac's narrow interpretation because the factual circumstances in those cases have no bearing on the violative conditions in this case. *See, e.g., Trinity Marine Nashville*, 275 F.3d at 431 (acknowledging there is inadequate notice where OSHA cited an employer after a prior OSHA inspector notified the same employer that the company's practices were satisfactory). Therefore, Mar-Jac's argument that it had inadequate notice fails, and the ALJ's findings should be upheld. Pet. Br. 13-21.

## III. Mar-Jac's Violation of the Safety Instruction Sign Standard, 29 C.F.R. § 1910. 145(c)(3), is Serious Because It Could Lead to Death or Serious Harm and Did.

B.B. died from working in the Line 2 eviscerator's zone of danger where there were no signs instructing employees to avoid the carousels' catch point and rotating parts hazards. Dec. 1, 15-17; Exs. C-5, C-6, R-14; Tr. 37-38, 74:17-18, 75—76:1-17, 77:1-19, 94:21-25 – 96:1-5, 105, 134:3-11. A serious violation exists when there is "a substantial probability that death or serious physical harm could result [from a

violative condition] . . . unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation." 29 U.S.C. § 666(k). "This does not mean that the occurrence of an accident must be a substantially probable result of the violative condition but, rather, that **a serious injury is the likely result if an accident does occur.**" *ConAgra Flour*, No. 88–2572, 1992 WL 215113, at *7 (OSHRC Aug. 18, 1992) (emphasis added).

This Court has long affirmed the Commission's understanding of a "serious violation." For example, in *East Texas Motor Freight, Inc. v. Commission*, this Court explained that "a violation is 'serious' if it 'make(s) possible an accident involving a substantial probability of death or serious injury." 671 F.2d 845, 849 (5th Cir. 1982) (quoting *Shaw Constr., Inc. v. Occupational Safety & Health Review Comm'n*, 534 F.2d 1183, 1185 (5th Cir. 1976). And in *Shaw Construction, Inc.*, the Court clarified that a violation may be determined to be serious "where, although the accident itself is merely possible . . . there is a substantial probability of serious injury if it does occur." 534 F.2d at 1185 n.4 (internal quotation marks and citation omitted).

Substantial evidence supports the ALJ's finding that death or serious physical harm could result from Mar-Jac's failure to post and enforce a safety sign instructing employees not to place their hands in the Line 2 eviscerator's zone of danger—and in fact, it did. Dec. 21. The record is replete with evidence that contacting the eviscerator's rotating carousels was seriously hazardous, which Mar-Jac does not dispute. Tr. 114:19 – 117, 210, 213; Ex. R-2 at 578; C-1 at 1. And Mar-Jac was aware that it did not post signs advising employees about the catch point and rotating parts hazards on the Line 2 eviscerator. *See* Argument part II.B. *supra* at 37-38.

Importantly, the Commission has affirmed a serious characterization for an employer's failure to use adequate labels warning employees of serious injury from hazardous workplace exposures in similar contexts. For instance, in *Emery Chemicals*, the Commission affirmed a serious violation of the hazard communication standard's labeling provision that intends to warn employees of the hazards associated with chemical exposure. *Emery Chemicals, Div. of Nat'l Distillers & Chem. Corp.*, No. 86-457, 1987 WL 245400, *1-2, 7 (OSHRC May 4, 1987) (affirming a serious violation of 29 C.F.R. §

1910.1200(f)(1)(ii)). In that case, the employer affixed warning labels on hazardous chemicals containers that generally warned employees of hazardous chemical exposure but did not specifically warn employees of the serious harm to the eyes that could result from chemical exposure as required by the standard. *Id.*

Notably, the hazard communication standard's warning label requirements at issue in *Emery Chemicals* and the safety instruction signs standard's requirements at issue here achieve similar purposes—both standards seek to protect against hazards that could result in accidental injury. And like the labeling violation in *Emery Chemicals*, Mar-Jac's failure to post safety signs could result in serious injury—and did. No. 86-457, 1987 WL 245400, *1-2, 7. Given the Commission affirmed the serious characterization for the labeling violation in *Emery*, Mar-Jac's argument that violations of a similar nature are per se other-than-serious is unavailing. Pet. Br. 33

Therefore, the ALJ correctly characterized Mar-Jac's safety instruction signs violation as serious.

## IV. Mar-Jac Did Not Establish the Affirmative Defense of Unpreventable Employee Misconduct Because Employees Flagrantly Violated Its Work Rule.

In arguing the affirmative defense of unpreventable employee misconduct, Mar-Jac established that the company (1) had a work rule prohibiting employees from reaching into the eviscerator while it was operating, but Mar-Jac did not prove that the company (2) adequately communicated its work rule, (3) took reasonable steps to discover violations of this work rule, or (4) effectively enforced this work rule. Dec. 19; *see W.G. Yates & Sons v. Occupational Safety & Health Rev. Comm'n,* 459 F.3d 604, 609 n.7 (5th Cir. 2006) (employer must establish all four elements of the defense to prevail).

As a preliminary matter, Mar-Jac's unpreventable employee misconduct argument is misguided because the departure from OSHA standards is the violation, rather than B.B's fatal incident. *See S. Hens,* 930 F.3d at 679 (rejecting the unpreventable employee misconduct defense where the employer misconstrued "the nature of the violation" and finding the lack of a lockout device constituted the violation, rather than the employee's failure to follow work rules); Pet. Br. 28-32. In other words, the violative conditions—not B.B.'s death—is relevant. *See Calpine Corp. v. Occupational Safety & Health Rev. Comm'n*, 774 F. App'x 879, 885 (5th Cir. 2019) (employees work in an unguarded

unmanned opening would constitute a violation even if it did not cause the decedent's death); Pet. Br. 31-32. Here, OSHA cited Mar-Jac for failing to guard the Line 2 eviscerator's carousels and post safety instruction signs.

Even if B.B. had not reached into the eviscerator and died from his injuries, the cited violations would remain because the Line 2 eviscerator's carousels were unguarded and Mar-Jac did not post signage instructing employees to avoid the serious harm that could result from contacting them. *Id.* Mar-Jac has not explained how employee misconduct could have contributed to the Line 2 eviscerator's unguarded condition nor the lack of safety signs. *See Sec'y of Labor v. Henkels & McCoy, Inc.*, 2022 WL 3012701, at *9 (rejecting the unpreventable employee misconduct defense where the employer "focuses on the cause of the incident" rather than the employer's own failure to properly maintain equipment, which constituted the violation).

Moreover, the record clearly establishes that Mar-Jac did not effectively enforce its work rule prohibiting employees from reaching into the eviscerator while it was operating. Employees and supervisors

flagrantly violated this rule and Mar-Jac had not disciplined any employees for this conduct. Dec. 19; Tr. 163:13-23.; *see* Argument II.A.1. *supra* at 24-29. Mar-Jac's supervisors' participation in the violative conduct "is strong evidence" that Mar-Jac's implementation of the work rule was "lax." *TNT Crane & Rigging, Inc. v. Occupational Safety & Health Rev. Comm'n*, 74 F.4th 347, 359 (5th Cir. 2023) (finding no unpreventable employee misconduct where a supervisor engaged in the violative conduct alongside employees). And this pervasive practice shows that "Mar-Jac did not take reasonable steps to discover violations of those work rules and did not effectively enforce those rules when they were violated." Dec. 19 (citing *Pride Oil Well Serv.*, No. 87-692, 1992 WL 215112, at *9 (OSHRC Sept. 24, 2021)); *see also Akron Brick*, 1976 WL 5896, at *2-*3 (where employees "habitually" violate the work rule, the work rule is "ineffectively applied").

Because substantial evidence supports the ALJ's finding that Mar-Jac employees and supervisors routinely accessed the zone of danger despite the company's work rule and Mar-Jac knew or should have known about the violations, Mar-Jac has failed to prove that it effectively enforced its work rule. *See* Argument II.A.1. *supra* at 24-29

and C. *supra* at 38-42; *TNT Crane & Rigging*, 821 F. App'x at 355

(citing *S. Hens*, 930 F.3d at 678 to note the unpreventable employee

misconduct "inquiry often overlaps considerably with the main violation

inquiry"). Thus, Mar-Jac cannot establish all four elements to prove

unpreventable employee misconduct.

Additionally, the ALJ did not err when admitting out of court

statements from two Mar-Jac employees as opposing party statements

under Federal Rule of Evidence 801(d)(2)(D). *See* Dec. 6; Tr. 108-14

(overruling Mar-Jac's objection); Pt. Br. 29-30. Statements offered

against an opposing party are not hearsay under this rule if the party's

employee offered statements on matters within the scope of

employment. FRE 801(d)(2)(D).  Here, CSHO Davis transcribed both

employee statements addressing matters regarding Mar-Jac's plant

operations, and the employees signed and corrected these statements

where necessary. Dec. 6-7; *see* Tr. 106-07; Exs. C-9, C-10. Thus, these

out of court statements are not hearsay under Rule 801(d)(2)(D) and the

hearsay exceptions in Rule 804(b) that Mar-Jac raised do not apply. *See*

FRE 801(d)(2)(D) and 804(b); Pet. Br. 29-30.

Even if this Court could find that the ALJ erred when admitting these out of court statements, the ALJ did not accord substantial weight to either statement. Dec. 7; Pet. Br. 29-30. The USDA inspectors' consistent testimony regarding employee practices at the plant provides substantial evidence even without corroborating evidence from floor person J.C. *See* Argument II.A.1. and II.A.2. *supra* at 22-35; Pet. Br. 28-29. Therefore, Mar-Jac's has failed to prove the affirmative defense of unpreventable employee misconduct.

## CONCLUSION

For the foregoing reasons, the Court should deny Mar-Jac's petition for review.

Dated: May 13, 2024                    Respectfully submitted,


                                       SEEMA NANDA
                                       Solicitor of Labor

                                       EDMUND C. BAIRD
                                       Associate Solicitor of Labor for
                                       Occupational Safety and Health

                                       LOUISE McGAULEY BETTS
                                       Counsel for Appellate Litigation

                                       /s/ LaNita L. McWilliams
                                       LANITA L. McWILLIAMS
                                       Attorney
                                       U.S. Department of Labor
                                       200 Constitution Ave., NW
                                       Suite S-4004
                                       Washington, DC  20210
                                       (202) 693-5426
                                       mcwilliams.lanita.l@dol.gov

                                       *Counsel for Respondent,*
                                       *Acting Secretary of Labor*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 13, 2024, I electronically filed the foregoing

using the court's CM/ECF system which will send notification of such

filing to the following:

> J. Larry Stine
> Sherifat E. Oluyemi
> Fisher and Phillips LLP
> jls@wimlaw.com
> seo@wimlaw.com
> *Counsel for Petitioner,*
> *Mar-Jac Poultry MS, LLC.*

Dated: May 13, 2024

*/s/* LaNita L. McWilliams
LANITA L. McWILLIAMS
*Counsel for Respondent,*
*Acting Secretary of Labor*

# CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limitation prescribed in Fed. R. App. P. 27(d)(2)(A) because, excluding parts of the document exempted by Fed. R. App. P.32(f), this document contains 11008 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word version 2403 in 14-point font size Century Schoolbook type style.

Dated:  May 13, 2024                          s/ LaNita L. McWilliams
                                              LaNita L. McWilliams

                                              *Counsel for Respondent,*
                                              *Acting Secretary of Labor*